May it please the court, my name is Greg Smith, appointed counsel for Steven Mason. I'm here to ask you to reverse and remand, but I also ask you today for a decision as soon as possible and before this court issues any written opinion because Mr. Mason is currently incarcerated only on a mandatory minimum sentence. So if you are inclined to reverse on any of our three grounds, please do issue a decision promptly without waiting for an opinion so Mr. Mason can again get released on bail during his remand as he was before the trial below. The three grounds here are strong. Brady violation, misjoinder and failure to sever, and misapplication of the safety valve. All three, including materiality on Brady, which really equates to the prejudice question, all three of our issues are reviewable de novo. On the Brady violation, I've never seen one this blatant. Even seasoned counsel below was shot. I don't know how prosecutors could possibly hold on to a smoking gun like this for over six months. Really nine months, especially when it's not even in the hands of law enforcement officers but the prosecutors themselves who were using the same information for their own purposes. You have to show that if you had the information earlier, that it would undermine the confidence in the outcome. How would that have happened here with Mr. Jazz's untimely death? Good question. Thank you. If you'd been told on March 10th that Walker had gotten a letter from one of his co-defendants saying, I plan to lie against the others at trial, if you're the defense lawyer, what would you have done? You would have immediately called up Walker's lawyer and asked for the letter. There's no reason to think that Walker's attorney would have refused the letter because he wasn't cooperating yet. If you meet with Walker and if you meet with Walker himself, you show him the letter, you get a sworn affidavit from Walker before he starts cooperating. Even if Walker's attorney did refuse, his attorney at least would have called the government, so the government likely would have talked to Walker's lawyer, would have found out about Jazz long before June 1st. Walker or any attorney, either Walker or an attorney for the government would have told defendants counsel. But what happens at trial is different. Jazz is dead. Jazz is dead, but you would have people that had spoken to Jazz. You don't get it in his evidence. There's no exception to hearsay that applies here. You use it for impeachment, right? And Jones was thoroughly impeached at trial, so that's what I'm trying to get at. What difference does it make? Well, there was a huge difference between how Jones was impeached at trial and how he could have been impeached with this evidence. All they had at trial for impeachment was, isn't it true you told the truth but late to the government agents who were interviewing you? That is a far cry from, isn't it true that you said you were going to lie on your co-defendants? We could have gotten, if it had been timely disclosed, you could have had a sworn interview with Walker, showing him this, getting him to acknowledge that Jazz had told him this. Couldn't they have done that anyway? They had the document. But it was delayed, Your Honor. They did get one chance, one chance through good lawyering to talk to Walker. They chose not to use it at trial. They tried to call Walker. Well, yes, but only because of the way it was structured. They spoke to Walker in December without the letter. They didn't know the letter existed. And that alone was prejudiced. If they'd been able to show the document to Walker, here's what would have happened. Walker either would have admitted it and then they could have had evidence that Walker admitted it or, well, that's probably what would have happened. They would have shown him and confronted him with the letter during their one interview. This was good lawyering below by the defense. They actually got a chance to talk to Walker in December. Before he clammed up, took the Fifth, wouldn't go in trial and wouldn't say, yes, this Jones wrote this letter and I knew it. They had one chance to talk to Walker, but they didn't have the letter. They didn't know about the letter. And when they finally did get the letter, Walker had changed his mind. They missed their chance to be able to say that. So what would have happened? Lots of different things would have happened. They would have had a chance to talk, find Jazz, talk to Jazz, get Jazz's uncle to corroborate what he said. And they could have called Walker or if Walker wouldn't testify, then at least you could have brought your investigator to take the stand. If Jones denied it, have your investigator say, well, I talked to Walker and Walker said that he did, in fact, write that. Plus, you would have had lots of arguments to make related to the hearsay exemption related to, who could have testified? Walker or Walker? Walker possibly, Jazz possibly, Jazz's uncle possibly, and any investigator, defense investigator that talked to any of those people potentially could have given a statement saying, yes, we heard that Jones wrote this letter. We know he failed the polygraph. This whole line of inquiry matters only for impeachment and it's effective only if Jones wrote that letter. And we know that the letter was subjected to handwriting analysis, which came back definitively that Jones did not write the letter. Well, if it was the government's expert said that and you're... And you had a chance to... Not anybody. Counsel had a chance to get another expert and was satisfied to leave that to the expert, the government's expert. Yeah, I don't know what to say about that. Maybe there's an ineffectiveness issue. I don't know the answer to that, but I take your point. But at the end of the day, we have evidence, we have forensic evidence to the effect that Jones did not write that letter. And that's why they didn't end up cross-examining him is because it had been stacked to where Jones could deny it and knew he'd be backstopped. The defense also wasn't able to put in the line when he said he didn't write that. But again, that's not before your honor on appeal. None of your speculation, that's pejorative, none of your hypotheticals about what might have happened, talking to Jones, talking to Walker, et cetera, there's no reason to think that any of that would impact the assessment of the handwriting expert. Not of the handwriting expert, but instead of the defense being too scared to raise this because of the handwriting expert, if they had evidence that they could have been able to get through other witnesses saying, yes, we heard Jones wrote this, it would have been at least a fair fight. The way it played out, the government had skewed it to where they had it lined up the way they wanted, where Jones was denying it, and despite the polygraph, they excluded the polygraph and they put in their own expert. But the defense, could the defense have done more and given their own expert? Sure. But what they also could have done and didn't do was, and because they didn't have a chance to do it, was to get witnesses that say that Jones wrote it. That's the piece that was missing and that would have changed the trial. This was a purely reasonable doubt case and it all depended on Jones's credibility. So anything that was undermining Jones's credibility was potentially going to affect this trial. So let's pursue that. Okay. So assume Jones is not a credible witness. You still have all of the wiretaps which show Mason conspiring with Jones. But not the mandatory minimum, if your honor, and that's the key piece. The jury decided the mandatory minimums and without Jones's testimony, they don't get a mandatory minimum conviction. They don't. Well, why not? I'm sorry, that's the 100 grams issue. Yes. So why wouldn't the government be able to fill in that evidence? Because it depended on Jones interpreting the wiretap evidence, your honor. But it's like four or five. What does that mean? So an FBI expert gets on. The four or five, that's right. What does it mean? And the only way they were able to get in evidence that that meant more than four or five grams, for example, was through Jones. But they knew how much Miller was receiving. Well, your honor, I don't agree with that analysis. I think it depended on Jones interpreting the evidence for them to get to the 100 grams. I appreciate that. I'm just trying to think of what other evidence there was and also what other evidence the government had. I believe that even at the sentencing, it was acknowledged by the district court below that they had depended on Jones to get them to the 100 grams. I understand. It's a fact. But was that the only evidence? There was nobody else saying he had distributed any large quantities, your honor. Mr. Smith, could you clarify for me again? We're dealing with a hypothetical here. Had there been an interview of Jazz before his death, how do you imagine that could have benefited? Well, it could have been a dying declaration. They also perhaps could have subpoenaed him and monitored him so he never died. A dying declaration? Well, they could have also attempted to use the residual hearsay exception for indicia of reliability. And that opportunity was deprived. They were deprived of that opportunity to present to the judge. And look, if you get Jazz saying it, if you get Walker confirming it, if you get Jazz's uncle confirming it, you start getting into indicia of reliability to where the hearsay exception on the residual exemption has a lot more credibility to it. That opportunity was denied. But the bigger question is, I just, I mean, look, they held on to a document that was just kryptonite for six months. And I don't know how this court feels about that. I just can't even fathom how they hold on to a document like this for as long as they can. The standard is prejudice, though, right? We're not here to supervise the processes. But here, I guess what I would say to the court is this, you know, it seems like the prejudice prong, you know, look, you have supervisory powers. It seems like the prejudice prong of Brady has been morphed into an unwritten timing rule on the other side, where it's supposed to be turned over immediately. But under the prejudice prong, they seem to have this view that if it's turned over a month before trial, it's a safe harbor. You know, they were spending weeks writing this and wordsmithing this 10-page single-spaced document, you know, when it contains Brady. I mean, they're supposed to be turned over immediately. Why aren't they turning it over piecemeal? Why are they wordsmithing this document for weeks? And then they turn it over a month before trial, and they're like, what do they got to complain about? It's a month before trial. We see this over and over. And it is dangerous to justice when they hold this kind of... Where's the law that says it needs to be turned over immediately? The law is pretty clear under Brady, Your Honor, that there's an obligation, the Brady obligation is immediate upon them receiving the information, particularly here when they're using it for their own purposes, but denying it to the defense, where they're confronting Jones in a debriefing... Where does it say that? You're making that statement. Give me a citation. I don't have it off the top of my head, Your Honor. I'm not certain it exists. I'm not certain the Supreme Court has ever said that. Your Honor, I believe it's... I will supplement it before it gets released. I think we've said in time to ensure effective trial preparation. That is... Well, see, this is the issue, Your Honor. There's the requirement of immediacy, but then if there is a violation, are you going to forgive it? The trial preparation relates to whether you're going to forgive it. And I guess this is what I'm saying. Instead of asking for permission, they're asking for forgiveness. That's exactly the mindset that seems to be taking place over here, that as long as they turn it over a month before trial, nobody's going to care. I think what Judge Griffith and I are asking you is not the question of prejudice, but the question of when the duty to disclose arises. I will provide... Your theory is it was in March at a time when the trial date hadn't been set. It wouldn't ... It wasn't going to be set until almost a year later. The government's still figuring out who are going to be their witnesses, who's cooperating, who's not. I don't know of any case that says they have to turn over evidence on that, at a stage like that, on the theory that some unforeseeable event might... A witness might die or a document might be destroyed or something like that. Well, let me supplement to the court, I think. What I would like to do is to move on to the severance issue, which I think is maybe even stronger. They falsely said that in their indictment that Miller and Mason had conspired together. That was not so. They never conspired together. And the fact that the government makes a false statement in its indictment can't possibly end the inquiry. More importantly, even if Rule 8 joiner can be upheld, the failure to sever Mason under Rule 14 analysis cannot be upheld. If Rule 8 is really that liberal, Rule 14 can't be a meaningless backstop. This was a highly unusual case. Not one involving mere risks of spillover prejudice, but this was spilled over prejudice. We had a juror who acknowledged that she was confused. She admitted she believed the evidence of guilt presented only against Miller was evidence of guilt against Mason, and she continued to harbor that belief despite previous efforts to clarify otherwise. The government tries to suggest that this view was not proven to be shared by the jury as a whole, but that isn't the standard. Mason is constitutionally entitled to a unanimous jury. One juror finding him guilty illegally or improperly is enough, and that's especially true since this juror also later turned out to be the foreperson. The most confused juror is the foreperson. The government said below and tries to say here that it carefully segregated the evidence between the defendants, but the record shows otherwise. The government's representation of the record below was false. They didn't surgically segregate the defendants. Frankly, they conflated the two intentionally. They affirmatively noted they had been arrested the same day, were the same age, and part of the same investigation in an effort to slyly convey to the jury and suggest improperly that there was some connection between them. When that led to juror confusion, how did the district court react? The court acceded to the government's demands that she couldn't tell the jury that their view of the evidence was wrong. Instead, she gave about as watered down an instruction as one can imagine. I believe you may get the answer to your question as the evidence continues, and if you don't, you can come back and ask me other questions. That is as weak as it gets, and the court's abdication of its own responsibility to ensure a fair trial onto the jury was insufficient. A judge can't say, I'll assume this trial is fair unless you, the jury, come back and tell me otherwise, especially when you're putting that on the one juror who is admittedly confused. Further clarifying efforts that ensued through the government's questioning of Jones were also sufficient. They weren't materially different than the earlier attempts that had failed when Carney had asked those questions, and at most, it only would have clarified the testimony of this one witness, Jones. Look at what the juror asked that Jones be questioned about. She said, ask Jones why he or Walker chose Mason's house for the drug delivery and whether he or Walker had a relationship with Mason or chose it at random. The confused juror may have heard evidence that Jones and Mason had a relationship and thought, well, that answers my question. There's no need to follow up. And the fact that Jones didn't know about Mason's house doesn't mean Walker didn't know about Mason's house. The question that she, the confusion that she had was not adequately cleared up by the clarification. And even if you did have assurance that the juror would necessarily have asked follow-up questions, which you don't, there's no reason to know that her verdict was not based in part on spilled over prejudice. Look, I understand severances are rare, severance issues that are successful are rare, but this is one. We don't ever see in the case law, all the cases cited by the other side, a situation where a juror specifically said, I believe that evidence against Defendant A is evidence of guilt as to Defendant B. That's what we have here. This is a highly unusual, extraordinary case, and the government didn't immediately clean this up after the jury asked that question and the court gave its watered-down instructions. It waited until later, wedging it in briefly before the wiretap evidence that was the most dramatic in the case, squeezing it in there to try to minimize the corrective effect. This wasn't a real effort to stanch the taint, addressing it head-on. Instead, it was buried with the government doing the bare minimum in a case where the government had also pushed the envelope in other ways. The fentanyl evidence, for example, trying to suggest my client was trying to kill his customers, over-the-top. Throughout this case, we see over-the-top. Brady withheld. The hints about these two defendants being related when they weren't, in an effort to slyly encourage the jury to think they were. The delayed correction. Throughout all of this, taken together, this appears to have been a win-at-all-costs persecution, and it ought to give this court pause. As the Supreme Court and this court have noted, motions for severance are particularly sensitive in conspiracy cases because of a recognized danger that guilt of one defendant may be transferred to another. As this court has also said, any serious doubts in this context must be resolved in favor of a defendant. Those doubts persist here and have not sufficiently been eliminated. Retrying this case would also be easy and quick. Most of the evidence below was against Miller, not Mason. This would be a very quick and easy retrial, and this court ought to uphold the sanctity of the process by sending this back for the quick and easy individualized trial that Mr. Mason deserves. Finally, as we noted, the court also lacked authority to...erred in believing it lacked authority to give Mr. Mason a mandatory minimum sentence because he was not asked about the evidence only related to this case. He was asked only about the names of those he had worked with in the drug trade generally and in the illegal drug trade generally, not specific to this case. All right. Why don't we hear from the government, who will give you some time on rebuttal? Thank you, Your Honor. I appreciate the time. Good morning, and may it please the court, Dan Lenners for the United States. To start with Judge Griffith and Judge Katz's question, this court has said that disclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case. Why the delay from June to December? What possible reason was there for the government to hold on to that? Your friend called it kryptonite. That's...certainly I'm not going to call it that, but it was very helpful information for Mr. Mason. Why did the government hold on to it for so long? Your Honor, the prosecutors involved in this case are no longer in the office, and so I am stuck with what they said on... Is that related to them having held on to it so long? Well, obviously I can't ask that. I haven't asked that personally, Your Honor. So I'm relying on the December 2017 motions hearing, what they said during that hearing, and inferences I've drawn from that. And the way I've read that hearing is to say that they believe this was impeachment, not exculpatory, which is true. That they believe that a month before trial was sufficient time for the defense to use impeachment information, and they had witnessed security concerns about disclosing the letter because its disclosure, they said, would only make sense in context if they revealed that Jones and Walker were cooperating with the government. And so at that point in June, Walker had just begun to debrief with the government. Jones had been debriefing, but had not yet entered a cooperation agreement. So telling the defense that Jones had written this letter would disclose that they were cooperating? How? It would disclose that Walker was cooperating because they got the letter from Walker, and Walker was the one who said that Jones had written it. We don't know that Jones wrote it. In fact, the handwriting analysis said that he didn't. So if it's over a Brady document, that signals that that person is cooperating and therefore is in jeopardy? That was the prosecutor's evaluation in this case, yes, Your Honor. Isn't that true in most of these conspiracy cases? Isn't what true, Your Honor? Cooperation is going on. It's true that cooperation is often going on, but who specifically is cooperating is not something that's broadly disclosed. So where is that listed as a Brady exception? Your Honor, it's not an exception. The prosecutors turned it over. They recognized that they were required under Brady to produce impeachment information. And in so doing, effectively disclose who's cooperating. Effectively disclose who's cooperating by showing who, from whom they got the letter, and also they had to reveal their efforts to verify whether Jones... All I'm trying to understand is why is that different in December than in June? Because by December they had a trial date a month away, and so at that point... It's irrelevant. Either they're going to plead, or they're going to trial. There's no indication here, unless they cooperate, that the government's going to enter into any plea deals. I'm sorry, I don't understand your question, Your Honor. It's relevant because by that point the government has to identify its cooperators because it has to identify its witnesses at trial and any impeachment information it has about them. I just have never seen that in a case. Maybe I just haven't noticed it. There are very real witness security concerns in many of our cases. Brady is implicating a constitutional interest. Yes, Your Honor. And the prosecutors... I don't see this as an exception. We're not... There's no claim of an exception here, Your Honor. All right. This Court has said that the... There's no... Neither this Court nor the Supreme Court has ever said that Brady information, whether exculpatory or impeachment, has to be produced by the defense to use it effectively in the preparation and presentation of their case. And in this case, the district court continued the trial to give the defense some time. So clearly the district court didn't think that was adequate. That's correct, Your Honor, and we aren't defending the timeliness of the disclosure. So why didn't you turn it over in June? Again, Your Honor, I'm relying on what the prosecutors said at the December hearing. They thought it was impeachment. Are there some U.S. attorney policies that are written about this? There's the Justice Manual, Your Honor. And what does it say about this? As for... Anything? It does, Your Honor. The Justice Manual distinguishes between exculpatory Brady and impeachment Brady. I don't have the exact quote for exculpatory Brady, but it has to be turned over very quickly. As to impeachment, what the... the prosecutors should take into account, the timeliness of turning it over, as to whether or not it's likely to disclose cooperators. Yes, Your Honor. It's in there? Yes, Your Honor. Justice Manual Section 9-5.001 says impeachment information will typically be disclosed at a reasonable time before trial to allow the trial to proceed efficiently. That didn't occur here. No, no, no, no, no, no, no. You didn't answer my question. It's not in the manual. That's all the manual says. The next sentence, Your Honor, is that in some cases, a prosecutor may have to balance the goals of early disclosure against other significant interests, such as witness security and national security, and may conclude that it is not appropriate to provide early disclosure. All right, so there's no national security here, right? So it's just the security of the witnesses who are cooperating? Yes, Your Honor. So here's my concern, if you can address it. Had the government notified Mr. Mason's counsel in March that this document existed, isn't it reasonable to assume that Mason's counsel would have reacted to that, would have sought out, as your friend identified, would have talked to Mr. Walker, would have sought out Jazz, would have pursued lots of lines of inquiries, all of which were foreclosed to them by the government's decision to sit on the document, and then the unfortunate happenstance of Jazz's death? There's a whole line of inquiry, a whole preparation for defense, that was foreclosed because of the decision to sit on it and not to disclose it. I'm talking about in March. I understand, Your Honor. I disagree with your characterization of sitting on the document. Okay. The government didn't have the document and didn't know for sure it existed until June. But they thought it was a credible enough story that they pursued it. The government pursued it, right? Yes, Your Honor. In March, all the government knew were two things, that Quokkwriter and an unrelated case said that Walker had showed him a letter, said it was written by one of Walker's 12 co-defendants, and that the writer said that he was going to lie about Walker, and that Jones denied writing or knowing about such a letter. That's all the prosecution knew. Well, the prosecutor could have picked up the telephone and talked to Walker's attorney. There's no reason to believe that Walker's attorney would have cooperated with the prosecution at this point. Well, you could find out. We'll never know, will we? We will never know, Your Honor. But all of that is speculative. But it's just an extraordinary situation to have a key potential government witness, one of the leaders of the drug conspiracy, to allegedly have written a letter, not just some casual conversation, or had somebody else write the letter for him, that he's going to go down to court and lie against everybody. I agree that it is impeachment information. The government didn't know that Jones was the alleged author until June. In March, all they knew is that Walker said one of his co-defendants, there were 12 of them, said that that person was going to lie about Walker. The government acted reasonably in continuing to investigate that by asking Jones about it, polygraphing Jones about it, asking Walker about it, as soon as he began to debrief with the government. This was not exculpatory or impeachment information that required immediate disclosure in March of 2017. You said you're not putting aside prejudice. You said you're not defending the timeliness of the disclosure in December. Are you taking the position that the government had no duty to disclose in March? Yes, Your Honor. Why is that? Because the information was too inchoate? Or because the trial date was too far off? All of those things, Your Honor. The government has a duty to disclose exculpatory and impeachment information. What it knew about in March was neither exculpatory nor impeachment. Suppose your friend is right that a disclosure in March could have led to fruitful lines of inquiry for the defense. I know you dispute that, but suppose he's right about that. Same answer? No duty to disclose in March? Yes, because it wasn't impeaching of a government witness with no trial date and no knowledge of the government's witnesses. Okay, suppose you actually had the document in March. Same answer? Again, Your Honor, even if the government had the document in March, there's no duty of immediate disclosure. And the defense can't establish prejudice even if the government had disclosed it. Put aside prejudice. Just when is the government supposed to disclose the document? And one way of thinking about the case is the legal rule is in time to allow effective preparation for trial. And as things turned out, the defense didn't have effective preparation for trial, unbeknownst to anyone, but they didn't because the witness died in the interim. Without knowing about the witness's death, the government had a duty under this court's precedent to disclose in time for the defense to make effective preparation and use, and a broader duty under the justice manual to disclose impeachment information to ensure that the trial may proceed efficiently. I guess, where did the government come up with the notion that the defense only needs a month to prepare for trial? Again, Your Honor, I'm relying solely on what the government attorneys said at the December hearing. But looking at the manual, it doesn't say anything about a month. You're right, Your Honor. The government has to make an evaluation as to how much time defense counsel needs to use impeachment information. Typically, impeachment information could presumably be used the next day because there's no investigation necessary. All it does is show that the witness is maybe saying something that's not true. We all know of defense attorneys representing clients who need more than a month. I just don't know if that's true. Well, we do know it's true. And I'm just not sure where this is coming from. Now, your response to me is, well, you're concerned that a defendant may be alerted that a government, a potential co-conspirator is a potential government witness and or cooperating with the government. And I guess I don't understand why any defense attorney wouldn't anticipate that in a drug conspiracy from one of the two leaders of the conspiracy. I mean, it's not as though you're disclosing a secret, what I'm trying to get at. It's assumed, basically, because that's the way the government operates in these drug conspiracy cases. It's sort of standard operating procedure. They indict a slew of people, and then they make deals. That's true, Your Honor, but the question isn't whether the defense attorney knows that. The question is whether these defendants are at risk from their co-defendants. It is atypical to have cooperation from the leader and to have cooperation downward. It is more typical to have cooperation from the underlings and have cooperation upward. Well, but we all know of instances where the leader cooperates as well. There are certainly instances of cooperation, Your Honor, but that doesn't mean that there aren't real witness security concerns for people who are identified as cooperators to their co-defendants who are in jail with them and can threaten their lives. These assaults and murders of witnesses and cooperators happen all the time. I know, but, you know, the theory is when you're in jail, you're supposed to be in secure protection. You're not being maintained there so people can injure you. That's right, Your Honor, and if a defendant is transferred to the secure protection wing, that's an indication that he's a cooperator, and that puts his family, who's on the outside at risk. It raises all sorts of security concerns, which is why. So as a practical matter, under this procedure, district courts ought to be aware that once they set a trial date, they'll probably have to continue it for two months in order to allow the defense to have an adequate time to prepare for trial. No, Your Honor. These prosecutors made a misjudgment as to the amount of time that the defense needed to use effectively and investigate the impeachment information produced in this case. No, I'm assuming good faith here. They thought a month was enough, but they were wrong. Yes, Your Honor, they made a misjudgment, but that doesn't change the fact that witness security is a very real concern that prosecutors should and must take into account when disclosing impeachment information that would identify the cooperators in that case. And if I may address the March information, regardless of the speculation that defense counsel engages in on appeal as to this series of events that somehow would have led them to discovering Bethea and Bethea identifying to a defense investigator, presumably that Jones wrote the letter, none of that would have been admissible at trial. Once Bethea died, anyone to whom he said Jones was the author would be testifying as the hearsay. There is no hearsay exception that would allow that in and would allow in Bethea's authentication of the letter. The residual exception, which relies on the reliability of the hearsay, doesn't apply here when the handwriting analysis said that it clearly was not Jones's handwriting. And Jones himself repeatedly denied writing this letter. And so regardless of whatever chain of events defense counsel speculates in, which I think this court has refused to do in this context to find prejudice, none of this would have led to admissible testimony about the letter's authorship at trial, which is why defense counsel cannot establish prejudice here. One more question about March. Suppose, hypothetically, government has the letter and suppose that Jazz was, the government knew that Jazz was elderly and very frail. His death in the actual case is unforeseeable, but imagine that it's very foreseeable. Is there an obligation to disclose in March under those facts or not? I'm not trying to be difficult, Your Honor. It's really hard for me to answer these questions on my feet. It's a hard question. I don't think that that factors into whether the defense can effectively use the material at trial. If they have the letter, presumably Walker has said that Bethea identified Jones as the author. So that presumably means that the government knows that it wants to find Bethea. It tried to find Bethea. The government sought Bethea in June itself and was unable to locate him. And so the government in this case made these reasonable efforts to track down this information to see for itself. And so I think in Your Honor's scenario, the government would have found Bethea and would have been able to interview him itself and evaluate his credibility as to the letter's authorship. I don't know. I mean, you're sort of fighting the hypo a little bit by asserting that this really wouldn't have been a fruitful line of inquiry. I mean, I'm trying to test the question. What happens in a circumstance where the defense has very real concerns about being able to develop lines of inquiry that are potentially important and you have very real concerns about witness protection and such? So I think there are certainly avenues to address witness protection in that scenario, such as an attorney's eyes only disclosure that prevents the defense attorneys from sharing with their clients and thus protects the cooperators from any sort of retribution. There are avenues that the government can take to disclose sooner exculpatory Brady that may raise witness security concerns. And so that may be a more appropriate approach to take in some cases. As to the prosecutors in this case, they identified Facebook posts publicly that gave them real concern about witness security issues in this case. The letter they believed was impeachment Brady. They apparently failed to see the additional investigation the defense would have to have, so they made a misjudgment and disclosed it later than they should have. But the defense can establish no concerns. The concerns about witness security in this case are in the record? That's what I'm entirely relying on, yes, Your Honor. In the December 2017 transcript, one of the prosecutors mentions Facebook posts by defendants with case-related information. As to the joinder and severance issue, I know I'm well over my time. I just want to talk about the government's response to the juror's question. The defense is the one who suggested that the juror's confusion be addressed by government questioning. That is, at JA 877, Mason's counsel proposed either that the court clear it up immediately by note or by having the government ask that just directly. It is true that those were not the first two questions out of government counsel's mouth when questioning of Jones resumed, but the way the government did it was actually more protective of Mason's rights. Mason had not yet been discussed except for a brief mention two days earlier in the case at all. Jones had not identified him sitting at counsel's table. There had been no important identification. Jones had not explained how he knew Mason or what Mason's role in the conspiracy was. And so to have the first two questions out be, did you have drugs sent to Mason's house, did you know his address, would not have made sense to the jury. What the prosecutor did was very quickly, within five pages of transcripts, set all of that up. Discussed Mason's role in the conspiracy, had Jones identify him, had Jones explain how he knew Mason, and then established that Jones had never used Mason's house for drug deliveries and didn't even know where Mason's lived. Under those circumstances, it wasn't the government squeezing it in. It was, in fact, the government setting up the questions in a way that would make sense to the jury and ameliorate any confusion. And this is an abusive discretion standard. It is not de novo for the Rule 14 severance. The district court did not abuse her broad discretion. Having sat in this trial in person, seeing the questions, seeing the effect on the jury, understood that there was no spillover prejudice necessitating a severance. If there are no further questions, we would ask that the judge make a motion. Thank you. Mr. Smith, before you begin, I wonder if you could, and we may be going over old ground here, but just to help me, I want to hear from you how you imagine you would be able to have used this letter at trial had you learned of it in March, or sometime before Jazz died. Give me your best scenario for how you would use it at trial. Well, I was in trial counsel, but yes, I think what you would have been able to do is to actually confront Jones. If it had been produced earlier, you would have been able to confront Jones by asking him, isn't it true that you wrote this, and if he said no, then to have impeachment evidence that you could then bring in to refute that. And tell me the nature of that impeachment evidence. Well, you could have brought your defense investigator in to say, I spoke to Jazz, and Jazz told me this, and that comes in under the residual hearsay exception. You could have brought in the uncle of Jazz, who they could have found, because they would have been able to speak to Jazz, who could have said, yes, Jazz told me. They could have subpoenaed the call records not nine months later of Jazz speaking to people that are apparently recorded. You could have had, where he may have even talked about how he had gotten this letter, a number of different ways that you could have gotten cell information. Instead of looking for cellmates nine months later, you could have verified that he was in a cell, Jones was in a cell with Jazz, or near a cell with Jazz. Maybe you could even find other cellmates that could say that they heard this conversation taking place. There are any number of different ways that you could have documented and verified this. And look, we're not the ones that put the government in this situation with them holding this. Let me just go back and address a couple of things. He says Mr. Landers is a fine, superb lawyer. They've done a great job with this case. But he says they're not defending the timeliness of this, but then he starts talking about the witness security concerns. It's just not persuasive. This is not a valid concern when my client is on bail because he is not a security risk, and when this is a guy turning down on underlings. At a minimum, they could have produced this pursuant to a protective order and given it just to the lawyers and had restrictions. The security concerns easily could have been covered, and eventually they got to disclose it anyway. They did disclose it, and there were no security concerns. Jones testified just fine, and there was no suggestion whatsoever that he had ever been threatened in any way. So it's totally overblown and a red herring. More importantly, you asked him should he have made the disclosures in March, and he says, well, no, but it was never addressed below. You should remand this case, especially since there are many factors that remain. You shouldn't say that this record is so clear that they didn't have to disclose in May. They talked about the other cooperator. The review is de novo, right? It is. So if you're right on that point, we would just assess it. You can, but where the record is not fully developed below because the court didn't address the March issue, there are other questions that remain. They say they got this information from another cooperator in another case, an unrelated case. Who is that cooperator? We still don't even know that cooperator. That's another thing you could have brought to the trial, bring that cooperator in. They never disclosed the name of the cooperator from the other case. Even today they haven't disclosed it to this day. In addition, he says the government, you know, well, we hadn't confirmed that this letter existed. Well, the threshold has never been that Brady isn't Brady until the government obtains physical evidence or confirms its existence. If a witness says, or say it's someone being debriefed, tells the government that a gun used in a robbery is silver instead of black, must the government actually obtain a silver gun before they disclose the statement? Of course not. Must they confirm the gun was silver before they reveal that statement? Of course not. Any such rule would make a mockery of Brady and undermine justice leading to wrongful verdicts. Let me just finally say, if the information was tangible enough for the government to confront Jones in debriefing, it was Brady then. If it was tangible enough for them to line up a polygrapher and to craft polygraph questions on this for Jones, it was Brady then. The rule here should be basic and fundamental. If they are affirmatively using exculpatory and impeachment information for their own purposes, they can't simultaneously withhold that same information from the defense. The government said at the end, well, we did try to find Bethea so we could interview him ourself. Well, that's exactly the problem. They wanted to stay a step ahead of the defense. That's what was going on here. They withheld Brady so they could stay a step ahead of the defense, and that's exactly what should trouble this court, and that's exactly why on that issue it should be reversed. On the severance, I just want to quickly say, he says, well, it wouldn't have made sense to the jury to deal with it immediately after the judge's instructions because the jury wouldn't have understood. The jury wouldn't have understood? Right after the judge is explaining, here's the question I just got asked, and then gave this modest, almost nothing curative instruction, the issue is right before the jury. That's the time to deal with it. If you want to cure the taint, you do what the defense lawyer specifically asked. I want this addressed, yes, by the government or the court, he said, but most important, he said, it needs to be addressed immediately. It wasn't addressed immediately, and that's why, in part, this court needs to sever. You've never seen a case like this where a juror, especially the foreperson, specifically says, I think evidence against Defendant A is evidence of guilt as to Defendant B. It's clearly coming from other witnesses besides Jones, and it was never clarified. Again, remember the standard. If there are doubts, then you have to rule for the defendant on the severance issue. It wouldn't be much to retry this case. We ask that you remain. Thank you. Thank you. We'll take the case under advisement.
judges: Rogers, Griffith, Katsas